# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JEFFERSON COMMUNITY HEALTH CARE CENTERS, INC.** | **CIVIL ACTION** |
| **VERSUS** | **CASE NO. 16-12910** |
| **JEFFERSON PARISH GOVERNMENT, et al.** | **SECTION: "G"(2)** |

## ORDER

Before the Court is Plaintiff Jefferson Community Health Care Centers, Inc.'s ("JCHCC") motion for a preliminary injunction, wherein it urges the Court to enjoin the enforcement of two resolutions passed by the Jefferson Parish Council ("Council") declining to renew lease agreements [or Cooperative Endeavor Agreements ("CEAs")] that Jefferson Parish ("the Parish") had with Plaintiff in two locations, Marrero and River Ridge, Louisiana, because the resolutions, they contend, violate the Medicaid Act, entitling them to relief pursuant to 42 U.S.C. § 1983, and that the actions taken by the Parish Council are preempted by federal law pursuant to Section 330 of the Public Health Service Act ("PHS Act").[1] The requested preliminary injunction would permit JCHCC to continue to use and occupy the Marrero and River Ridge facilities pending a trial on the merits in this matter.[2] Defendants' opposition fails to squarely address Plaintiff's stated claims pursuant to § 1983 or Section 330 of the PHS Act, but rather characterizes this matter as an untenable breach of contract claim.[3] Having reviewed Plaintiff's motion for a preliminary

---

[1] Rec. Doc. 2.

[2] *Id.*

[3] Rec. Doc. 12.

injunction, the memoranda in support and in opposition, the evidence presented at the hearing on the preliminary injunction, and the applicable law, for the reasons that follow, the Court will grant in part and deny in part Plaintiff's motion for a preliminary injunction. Specifically, the Court will enjoin the eviction of JCHCC until the opportunities for health care services for the underserved citizens are specifically addressed by either providing an appropriate vendor in the current facilities, or by providing other means of maintaining medical services to these specific communities. The motion is denied to the extent that once the Court is satisfied that the medical needs of these communities are being met, whether or not the Court has reached the merits of the case, the injunction will be lifted.

## I. Background

### A.    *Factual Background*[4]

Plaintiff JCHCC is a non-profit entity that receives federal funding under Section 330 of the PHS Act[5] to serve residents in medically underserved communities, regardless of their ability to pay.[6] In the aftermath of Hurricanes Katrina and Rita, the State of Louisiana and the federal government declared that a public health crisis exists in the Jefferson Parish metropolitan area, and Jefferson Parish determined that the public interest would be best served by enabling a local non-profit organization—JCHCC—to use facilities owned by the Parish to restore basic health services

---

[4] The following facts, based on the evidence attached to JCHCC and Defendants' memoranda and admitted at the evidentiary hearing, constitute the Court's "findings of fact" for purposes of Federal Rule of Civil Procedure 52(a). These findings of fact are not binding on the Court at a trial on the merits. *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012).

[5] 42 U.S.C. § 254b.

[6] Rec. Doc. 1-2 at 2.

to an underserved area of the Parish.[7]

Accordingly, in August of 2006, JCHCC entered into a CEA with Jefferson Parish that would, for a ten-year period ending on July 31, 2016, provide rent-free facilities to JCHCC at 1855 Ames Boulevard for the purposes of serving the medically underserved population in Marrero, Louisiana ("Marrero Agreement").[8] The CEA also stated that the "Lease shall be renewed under the same terms and conditions for an additional five year term, unless any of the parties notify the other parties in writing of its intent not to renew at least 60 days prior to the expiration of the term then in effect."[9] In exchange for a ten-year occupancy of the Marrero facility, JCHCC pledged to provide or coordinate for its patients a full range of primary care and clinical preventive services throughout Jefferson Parish, as it was obligated to by federal funding it had received from the Health Resources and Service Administration ("HRSA") of the U.S. Department of Health and Human Services pursuant to its grant application as a Federally Qualified Health Center ("FQHC"). The history of the River Ridge facility, located at 11312 Jefferson Highway, is less clear, but it is undisputed that River Ridge was never subject to a ten-year lease, and has operated instead on a month-by-month basis pursuant to a CEA that could be terminated at any time with 30 days' written notice.[10]

JCHCC took occupancy of the Marrero facility on August 1, 2006 and renovated it for

---

[7] Prelim. Inj. Ex. 2 at 2.

[8] *Id.* at 6.

[9] *Id.*

[10] *Id.*; *see also* Prelim. Inj. Ex. C at 3.

clinical purposes, investing nearly $1.5 million in federal Section 330 grant funds.[11]  The Marrero site serves approximately 8,000 patients annually and houses, in addition to medical and dental facilities, the primary administrative offices and information technology services for the JCHCC network.[12]  Although JCHCC serves a population of largely uninsured patients, the income generated from services rendered at the Marrero clinic now supports the cost of services that JCHCC provides at its other clinics in Avondale, Lafitte, and River Ridge.[13]

In 2009, an independent audit of JCHCC pursuant to 42 U.S.C. § 254b(q) led to several adverse findings and remedial actions, and the federally mandated audit precipitated two audits by the Louisiana Legislative Auditor ("LLA").[14]  In reports published in 2010 and 2012, the LLA found that the prior management of JCHCC had engaged in widespread misconduct, including commingling and misappropriation of funds, improper lending to employees, and overpayments to contractors.[15]  In the wake of the audits, JCHCC's then-CEO, Carol Smith, resigned and the former CFO, Ebony Williams, pled guilty to and was later convicted of embezzlement.[16]  JCHCC nearly lost its federal funding,[17] and HRSA required a corrective action plan that included seeking recoupment of the previously misspent funds.[18]

---

[11] Prelim. Inj. Test. of Dr. Shondra Williams.

[12] *Id.*; *see also* Rec. Doc. 1-2 at 4.

[13] Prelim. Inj. Test. of Dr. Shondra Williams.

[14] *Id.*; *see also* Rec. Doc. 1-2 at 5.

[15] Prelim. Inj. Test. of Dr. Shondra Williams; *see also* Rec. Doc. 1-2 at 5.

[16] Prelim. Inj. Test. of Dr. Shondra Williams; *see also* Rec. Doc. 1-2 at 6.

[17] Prelim. Inj. Test. of Dr. Shondra Williams.

[18] *Id.*; *see also* Rec. Doc. 1-2 at 8.

In September 2012, Dr. Shondra Williams ("Dr. Williams") began serving as JCHCC's CEO.[19] In that capacity, she has spearheaded JCHCC's effort to implement its corrective action plan, required by HRSA as a condition of its continued participation in the Section 330 federal program.[20] Dr. Williams sent demand letters to individuals identified in the LLA audit reports as having received payments to which they were not entitled, including JCHCC's former CEO, Carol Smith, and its former attorney, Clarence Roby, who had allegedly received $140,000 for legal services that an LLA audit found to lack sufficient supporting documentation.[21] Soon after sending the demand letters, Dr. Williams received a fax message from the office of Councilman Spears in November 2012 including a proposed resolution to terminate the Marrero CEA.[22] Dr. Williams perceived the message as a threat precipitated by JCHCC's corrective action plan, given the political and personal relationships between the individuals who were sent demand letters and both Councilman Spears and his predecessor, former Councilman Byron Lee.[23]

After receiving the message, Dr. Williams contacted Councilman Spears but did not receive a response.[24] However, when Dr. Williams attended a Parish Council meeting on November 7, 2012, she learned that the proposal to terminate JCHCC's cooperative endeavor agreement was not on the meeting agenda, and following the meeting, Councilman Spears told Dr.

---

[19] Prelim. Inj. Test. of Dr. Shondra Williams; *see also* Rec. Doc. 1-2 at 2.

[20] Prelim. Inj. Test. of Dr. Shondra Williams; *see also* Rec. Doc. 1-2 at 7.

[21] Prelim. Inj. Test. of Dr. Shondra Williams; *see also* Rec. Doc. 1-2 at 8, 12.

[22] Prelim. Inj. Test. of Dr. Shondra Williams; *see also* Rec. Doc. 1-2 at 8–9; Prelim. Inj. Ex. 5.

[23] Rec. Doc. 1-2 at 9.

[24] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 9.

Williams that the Council had canceled the resolution.[25]  Afterward, Dr. Williams arranged to meet with Councilman Spears at his office on November 19, 2012.[26] At that meeting, the councilman expressed to Dr. Williams that no one from JCHCC had reached out to him in the eleven months since he took office, and he commented that "several" entities were interested in occupying the Marrero space.[27] Councilman Spears allegedly then requested that Dr. Williams appoint an acquaintance of his to the governing board and terminate the CFO, who had participated in the LLA audit that resulted in negative findings.[28] On another occasion, Councilman Spears suggested that JCHCC should hire an attorney whom he recommended.[29] Later, Councilman Spears told Dr. Williams that he would only be interested in modifying JCHCC's CEAs to allow continued use of the Marrero facility if JCHCC satisfied his requests.[30]

In April 2014, Dr. Williams finally met with Councilman Spears, who during the meeting requested information regarding the percentage of minority-owned vendors utilized by JCHCC.[31] Dr. Williams indicated that JCHCC has followed procurement policies regarding vendor selection and utilization, and currently utilizes more than 50% minority vendors.[32] However, following the meeting, Dr. Williams learned that Councilman Spears approached two of JCHCC's board

---

[25] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 9.

[26] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 9.

[27] Rec. Doc. 1-2 at 9.

[28] *Id.*

[29] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 9.

[30] Rec. Doc. 1-2 at 10.

[31] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 14.

[32] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 14.

members to request information about JCHCC's vendors.[33] One year later, in April 2015, Dr. Williams became aware that Councilman Spears attempted to persuade several JCHCC board members to terminate her employment as JCHCC's CEO, without giving a reason.[34]

Another year later, on April 5, 2016, former JCHCC CEO Carol Smith sent Dr. Williams a demand letter requesting $184,000 in severance pay.[35] After reviewing the demand, JCHCC denied it.[36] Shortly afterward, JCHCC received a letter dated April 14, 2016 from the Office of the Parish Attorney, indicating that the Parish desired "alternative lease terms" and attaching two resolutions that would, respectively, terminate the Marrero CEA and replace it with a month-to-month arrangement.[37] The Marrero Agreement was otherwise set to renew automatically for a five-year term after July 31, 2016.[38]

The proposed resolutions were included on the Jefferson Parish Council's agenda for April 20, 2016.[39] At the meeting, representatives of JCHCC, along with dozens of its patients and community supporters, voiced their concerns about the two resolutions.[40] No individual spoke out against JCHCC's position.[41] Afterward, the Council engaged in an off-the-record, four-hour

---

[33] Rec. Doc. 1-2 at 15.

[34] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 15.

[35] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 15.

[36] Rec. Doc. 1-2 at 15.

[37] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 15.

[38] Prelim. Inj. Ex. A at 6.

[39] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 16.

[40] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 17.

[41] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 17.

executive session, after which Councilman Spears did not return.[42]  The Council therefore deferred the vote on the two resolutions to May 11, 2016.[43]

On May 10, 2016, Dr. Williams, several board members, and JCHCC's counsel met privately with Councilman Spears to attempt to find a workable solution.[44]  Councilman Spears insisted on taping the meeting and stated that he would not answer any questions from JCHCC.[45] The next day, without having previously provided any notice that such a resolution would be considered on that day, and without any discussion, Jefferson Parish Council voted unanimously to terminate the CEA for JCHCC's River Ridge facility, which the Council unanimously adopted as Resolution No. 127020.[46]  The Council then also unanimously voted to terminate the Marrero Agreement as of July 31, 2016, and adopted Parish Council Resolution No. 127051.[47]

On June 8, 2016, the Parish adopted a resolution, No. 127197, to authorize the Parish Clerk to advertise for submissions of Statements of Qualifications from prospective healthcare providers to offer full-time comprehensive medical care to uninsured individuals at the River Ridge and Marrero locations.[48]  JCHCC partnered with Ochsner Health System, which submitted a Statement of Qualification, with JCHCC as its subcontractor, for use of the Marrero and River Ridge

---

[42] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 17.

[43] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 17.

[44] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 18.

[45] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 18.

[46] Rec. Doc. 1-2 at 18.

[47] *Id.* at 19.

[48] *Id.*

facilities.[49]  No other submissions were received by the notice's June 30 submission deadline, and thus Councilman Spears unilaterally extended the deadline until July 14, 2016, and again to August 4, 2016.[50]  To date, no other statements of qualifications by interested healthcare providers have been submitted to the Parish Clerk.

## B.   Procedural Background

Plaintiff filed a complaint,[51] as well as motion for a temporary restraining order and preliminary injunction,[52] on July 18, 2016 against Parish of Jefferson,[53] Jefferson Parish Council, Ricky J. Templet, Paul D. Johnston, Mark D. Spears, E. Ben Zahn, III, Jennifer Van Vrancken, Christopher L. Roberts, and Cynthia Lee-Sheng (collectively, "Defendants"). On July 19, 2016, the Court held a telephone status conference with counsel for Plaintiff and an attorney from the Jefferson Parish Attorney's Office.[54] At the conference, counsel stipulated that no action would be taken to evict Plaintiff from either the Marrero or River Ridge facilities until July 31, 2016.[55] Accordingly, the Court issued an order denying as moot the motion for a temporary restraining order and setting the preliminary injunction for hearing on Friday, July 22, 2016 at 11 a.m.[56] The

---

[49] *Id.*

[50] *Id.* at 19–20.

[51] Rec. Doc. 1.

[52] Rec. Doc. 2.

[53] In their opposition to the instant motion, Defendants assert that Plaintiff states an incorrect name of Jefferson Parish Government.

[54] Rec. Doc. 6.

[55] *Id.*

[56] Rec. Doc. 7.

Court heard the matter on that date, and took the motion under advisement after the conclusion of all testimony and oral argument.[57]

## II. Legal Standard

Four elements must be proven before a court will issue a preliminary injunction: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is denied; (3) the threatened injury to the movant outweighs the injury to the nonmovant; and (4) granting the injunction will not disserve the public interest.[58] If the movant fails to meet its burden regarding any one of the necessary elements, a court need not address the other elements necessary for granting a preliminary injunction.[59] At all times, the burden of persuasion remains on the movant as to each of these four elements.[60] However, these factors "are applied on a case-by-case, sliding-scale basis. Where one or more of the factors is very strongly established, this will ordinarily be seen as compensating for a weaker showing as to another or others."[61]

---

[57] Rec. Doc. 24.

[58] *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192,195–96 (5th Cir. 2003) (citing *Canal Auth. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)).

[59] *See Roho, Inc. v. Marquis*, 902 F.2d 356, 361 (5th Cir. 1990) (declining to address the remaining elements necessary to obtain a preliminary injunction after finding that plaintiff failed to show a substantial likelihood of success on the merits); *see also Barton v. Huerta*, 613 F. App'x 426, 427 (5th Cir. 2015) ("[F]ailure to succeed on any one of the elements results in a denial of injunctive relief.").

[60] *Callaway*, 489 F.2d at 573 (vacating an injunction where the district court improperly placed the burden of persuasion on the defendants to prove the injunction should not be granted, rather than requiring plaintiffs to carry their burden).

[61] *Knights of Ku Klux Klan, Realm of La. v. E. Baton Rouge Par. Sch. Bd.*, 578 F.2d 1122, 1125 (5th Cir. 1978).

Whether to grant or to deny a preliminary injunction is within the discretion of the trial court,[62] but "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule."[63]

### III. Parties' Arguments

A.   *Substantial Likelihood of Success on the Merits*

    **1.**    **JCHCC's Arguments in Support of Preliminary Injunction**

JCHCC argues that it is entitled to relief under 42 U.S.C. § 1983 because the Jefferson Parish Council resolutions violate the Medicaid Act.[64] According to JCHCC, Medicaid beneficiaries have a right to obtain certain services as enrollees of the Medicaid program, including, specifically, FQHC services.[65] Plaintiff alleges that, as a Section 330 grantee, it is automatically designated as a FQHC for purposes of its participation and reimbursement in Medicaid.[66] Therefore, JCHCC argues, it must provide FQHC services to all Medicaid beneficiaries, as defined at § 1396(a)(2)(C).[67]

According to Plaintiff, Congress conferred an express right for Medicaid beneficiaries to receive such services.[68] Plaintiff relies on *Cohen v. Chester County Department of Mental Health*

---

[62] *Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir. 1984).

[63] *Miss. Power & Light*, 760 F.2d at 621.

[64] Rec. Doc. 2 at 12.

[65] *Id.*

[66] *Id.* (citing 42 U.S.C. §§ 1396 *et seq.*).

[67] *Id.*

[68] *Id.* (citing *Cohen v. Chester Cty. Dep't of Mental Health Intellectual Disabilities Servs.*, 2016 WL 3031719, at *6–9 (E.D. Pa. May 24, 2016)).

*Intellectual Disabilities Services*, a case from the Eastern District of Pennsylvania, for the proposition that it can sue Defendants under § 1983 for violating the Medicaid Act.[69] In *Cohen*, Plaintiff alleges, a Medicaid beneficiary who was developmentally disabled brought a claim under § 1396a(a)(8) of the Medicaid Act alleging that the defendants failed to provide all individuals seeking medical assistance under the plan an opportunity to do so with reasonable promptness.[70] According to Plaintiff, the district court concluded that "[w]here Congress required states accepting Medicaid funding to provide certain services to the developmentally disabled, Congress conferred specific entitlements on individuals in terms that could not be clearer and [are] therefore individually enforceable in an action brought under 42 U.S.C. 1983."[71]

Here, JCHCC argues, a private right of action should also be implied on behalf of the health care center.[72] Similar to the provision in *Cohen*, JCHCC contends, Section 1396a(a)(10) expressly provides that states must make "medical assistance available, including at least [FQHC] services."[73] Therefore, Plaintiff claims, pursuant to § 1396a(a)(1) and § 1396d(a)(2)(C), a state or local government that unlawfully interferes with or restricts an FQHC's ability to provide FQHC services is infringing on a beneficiary's right to those services.[74] JCHCC argues that by unlawfully terminating its CEAs and precluding JCHCC from offering mandatory FQHC services, the Parish,

---

[69] *Id.*

[70] *Id.* at 13 (citing *Cohen*, 2016 WL 3031719, at *7).

[71] *Id.* (quoting *Cohen*, 2016 WL 3031719, at *7).

[72] *Id.*

[73] *Id.*

[74] *Id.*

acting under color of state law, has effectively severed established provider-patient relationships and deprived Medicaid beneficiaries from receiving FQHC services at JCHCC's Marrero and River Ridge sites.[75] Moreover, JCHCC argues, because Section 330 health centers exist to serve patients who reside in "medically underserved" areas, Medicaid recipients cannot simply find another readily accessible provider.[76]

Alternatively, JCHCC argues, even if it is not entitled to relief under § 1983, JCHCC maintains a strong likelihood of success on the merits because the Council's resolutions are preempted by Section 330 of the PHS Act.[77] Specifically, JCHCC contends, the Council's adoption of the resolutions at issue is a culmination of a series of efforts by Councilman Spears to influence JCHCC for his own personal and political gain, and if JCHCC had acquiesced in his actions, it would have violated Section 330.[78]

Plaintiff alleges that, as a threshold matter, it is a federal grantee with an implied right of action under Section 330 of the PHS Act.[79] To imply a private right of action under a federal statute, Plaintiff argues, the Court must assess whether: (1) the plaintiff is in the class for whose especial benefit the statute was enacted; (2) there is any indication of legislative intent, explicit or implicit, either to deny or to create a private right to enforce; (3) a private right to enforce would be consistent with the underlying purpose of the statute; and (4) the cause of action is not

---

[75] *Id.* at 14.

[76] *Id.*

[77] *Id.*

[78] *Id.*

[79] *Id.*

traditionally in the purview of state law, such that a federal right to enforce would be inappropriate.[80] Here, JCHCC avers, each factor weighs in favor of JCHCC maintaining an enforceable right under Section 330.[81]

First, Plaintiff argues, Congress enacted Section 330 for the especial benefit of community health center grantees, such as JCHCC.[82] At its essence, JCHCC claims, it is an instrument of the federal government, with statutory mandates to meet certain federal policy objectives and requirements, and its existence is entirely dependent on federal grant funding.[83] Those obligations come with federal rights and benefits, JCHCC avers, including an enforceable right for Section 330 health centers to receive 100 percent of their reasonable costs in furnishing services to Medicaid and Medicare beneficiaries.[84] Furthermore, Plaintiff asserts, Section 330 health centers and their employees are deemed to be federal employees of the Public Health Service and are afforded statutory immunity for malpractice claims.[85] According to JCHCC, it is also heavily regulated by HRSA, and any change to the scope of its projects—including any changes to the location of JCHCC's facilities—must be approved by HRSA.[86] Therefore, JCHCC argues, it is, for purposes of this action, necessarily acting as or on behalf of its grantor agency.[87]

---

[80] *Id.* at 14–15 (citing *Cort v. Ash*, 422 U.S. 66, 78 (1975)).

[81] *Id.* at 15.

[82] *Id.*

[83] *Id.*

[84] *Id.*

[85] *Id.* (citing 42 U.S.C. § 233(a) and (g); *Hui v. Castenada*, 559 U.S. 799 (2010)).

[86] *Id.* at 16.

[87] *Id.*

Next, JCHCC claims, there is no indication of legislative intent to deny injunctive relief in situations like the one presented here, and it is consistent with the underlying purposes of Section 330's legislative scheme to imply such a remedy to JCHCC.[88]  Similarly, Plaintiff argues, the cause of action raised here is not one traditionally relegated to state law, but rather is rooted in federal laws that impose affirmative duties on a grantee to fulfill its federal project and safeguard its assets, but do not explicitly provide for a cause of action against those who seek to thwart the accomplishment of that mission through unlawful government action.[89]  JCHCC argues that Jefferson Parish Council impaired a federal grant project, and here, federal laws put the health center grantee in the position of a trustee on behalf of its federal grantor agency, to protect and fulfill a federal mandate.[90]  As such, JCHCC argues, it has the characteristics of a federal instrumentality, even if it is not explicitly designated as such under the law.[91]

Finally, JCHCC argues that the Council's resolutions are patently unlawful and impair JCHCC's ability to carry out its federal grant project because they constitute retaliation for JCHCC's resistance to Councilman Spears' efforts to manipulate its operations.[92]  According to JCHCC, its resistance was required by federal law, and therefore the Council's unlawful actions, including the resolutions, must be preempted by that federal law.[93]  Specifically, Plaintiff contends,

---

[88] *Id.* (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694 (1979)).

[89] *Id.* (citing *Cort v. Ash*, 422 U.S. 66, 78 (1975)).

[90] *Id.* at 16–17.

[91] *Id.* at 17 (citing *Dep't of Transp. v. Ass'n of Am. R.R.s*, 135 S. Ct. 1225 (2015); *Neukirchen v. Wood Cty. Head Start, Inc.*, 53 F.3d 809, 812–14 (7th Cir. 1995)).

[92] *Id.*

[93] *Id.* at 18.

15

Councilman Spears attempted to coerce JCHCC to cease the implementation of its corrective action plan by sending Dr. Williams a fax purporting to terminate its lease early, to encroach on JCHCC's board of director's exclusive authority to hire and fire its CEO, to influence JCHCC's vendor selection contrary to federal procurement laws, and to interfere with JCHCC's collection of payments made to JCHCC's former CEO and attorney.[94] JCHCC alleges that such overtures interfered with its obligations under Section 330, which does not contemplate any involvement of local government officials in the health center's governance.[95] According to JCHCC, that authority is reserved to its board of directors, and therefore there was no legitimate reason for Councilman Spears to be involved with JCHCC's decisions, particularly in light of the findings of the recent legislative audits.[96] Therefore, Plaintiff argues, had it agreed to any of Councilman Spears' requests, it would have exposed itself to civil and criminal sanctions for violating federal law.[97]

Plaintiff argues that the Parish Council's behavior clearly evinces an effort to attach personal and political strings to its "donation" of facility space, and the record of the resolutions is devoid of any rational basis or explanation, particularly in light of strong community support for JCHCC.[98] JCHCC alleges that the Council has never communicated to JCHCC any dissatisfaction regarding the quality or availability of the health care services it offers, and by seeking a tenant

---

[94] *Id.*

[95] *Id.*

[96] *Id.* (citing 42 U.S.C. § 254b(k)(3)(H)(ii); 42 C.F.R. § 51c.304(d)(3)(ii)).

[97] *Id.* at 19.

[98] *Id.*

with identical qualifications to replace JCHCC, the Council has both conceded the ongoing need for a Section 330 grant project and revealed that its resolutions to oust JCHCC are purely retaliatory.[99] In fact, JCHCC argues, it was the only applicant to submit a timely application in response to the Council's request for bids, yet the Council failed to respond and instead extended the deadline for applications.[100]

JCHCC alleges that without a long-term agreement for its Marrero Clinic, JCHCC cannot provide reliable access to primary healthcare services.[101] Moreover, JCHCC has argued that trying to operate a medical facility pursuant to only a month-to-month contract generates a high level of uncertainty and is unsustainable. As a result, JCHCC asserts, the Council's decision to terminate JCHCC's CEAs thwarts JCHCC from fulfilling its Section 330 health care obligations to medically underserved patients across its service area.[102]

### 2. Defendants' Arguments in Opposition to Preliminary Injunction

In opposition, Defendants argue that under the terms of the Marrero Agreement, the lease would automatically renew for an additional five years after July 31, 2016, unless either party notified the other party, in writing, of its intent not to renew at least 60 days prior to the expiration of the lease.[103] According to Defendants, on April 14, 2016, 109 days prior to the expiration of the CEA, Jefferson Parish notified JCHCC and its counsel of the Parish's intention not to renew the

---

[99] *Id.* at 20.

[100] *Id.*

[101] *Id.*

[102] *Id.* at 21.

[103] Rec. Doc. 12 at 2.

lease, but offered to enter into a new agreement with terms and conditions consistent with another CEA between the parties—the River Ridge Agreement—which, according to its terms, was a month-to-month lease with a clause that allowed Jefferson Parish to cancel the agreement upon 30 days' written notice.[104] Therefore, Defendants argue, the Council, at its May 11, 2016 meeting, ultimately passed Resolution No. 127051, allowing the Marrero Agreement to expire according to its terms, as well as Resolution No. 127020, which terminated the River Ridge Agreement.[105] Finally, Defendants contend, on June 27, 2016, Jefferson Parish mailed to JCHCC copies of the two resolutions, thereby notifying JCHCC that both of the CEAs would terminate on July 31, 2016.[106]

In light of these facts, Defendants assert that JCHCC cannot demonstrate a substantial likelihood of success on the merits.[107] According to Defendants, the Council's April 14, 2016 correspondence to JCHCC's CEO was not an effort or even an indication of the Parish's intention to terminate the JCHCC's use of the Marrero premises, but, rather, clearly stated that Jefferson Parish desired alternative lease terms that were consistent with the River Ridge Agreement.[108] That CEA, Defendants assert, was entered into on October 27, 2015, and unlike the Marrero Agreement's initial ten-year term, provided for a month-to-month lease.[109] In addition,

---

[104] *Id.*

[105] *Id.*

[106] *Id.*

[107] *Id.*

[108] *Id.* at 4.

[109] *Id.* at 5.

Defendants contend, the River Ridge Agreement allowed the Parish to terminate the agreement at any time by giving 30 days' written notice.[110]

According to Defendants, on May 11, 2016, the Council conducted its regularly scheduled council meeting and, during the open session, unanimously passed Resolution No. 127051, stating in pertinent part that the Council would provide notice to JCHCC that it did not wish to renew the existing Marrero Agreement.[111] On the same day, Defendants assert, the Council passed Resolution No. 127020, which terminated the River Ridge Agreement.[112] Defendants aver that although JCHCC argues that it seeks injunctive relief to prevent Defendants from depriving the Medicaid beneficiary patients of JCHCC's Marrero and River Ridge sites from receiving mandatory medical services, Plaintiff's argument is misleading because Jefferson Parish in fact has neither banned nor prevented JCHCC from operating in River Ridge or Marrero.[113] Instead, Defendants assert, the Parish provided timely notice of its contractually permitted decision not to renew the leases and formalized the terminations via resolution at the May 11, 2016 Council meeting.[114] Defendants argue that because JCHCC cannot clearly demonstrate that the CEAs were unlawfully terminated, granting the preliminary injunction would be improper.

---

[110] *Id.*

[111] *Id.* at 6.

[112] *Id.*

[113] *Id.*

[114] *Id.* at 7.

19

B.      *Substantial Threat of Irreparable Harm*

1.      **JCHCC's Arguments in Support of Preliminary Injunction**

Plaintiff argues that it will suffer irreparable harm absent injunctive relief because deprivation of medical care is irreparable harm as a matter of law.[115] This is particularly so, JCHCC avers, when the medical care at issue is being provided to an area and a population that the federal government has specifically designated as "medically underserved."[116] JCHCC asserts that the Council's purported termination of JCHCC's service locations would interfere with its federal grant project to meet that need, and if implemented, the resolutions would disrupt care to thousands of patients, many of whom suffer from chronic diseases, by effectively terminating their primary care provider relationships and resurrecting a barrier to health care that JCHCC's grant project sought to eliminate.[117] Plaintiff argues that, because JCHCC's patients are in a medically underserved area, they cannot simply relocate to another provider to obtain services.[118]

In addition, Plaintiff claims, if JCHCC is not permitted to stay in the Marrero facility, its entire federal grant project will be at risk because the Marrero Clinic provides administrative and financial support to JCHCC's other three facilities.[119] As a consequence, JCHCC argues, its other locations would necessarily have to restrict their services, and consequently they would have fewer

---

[115] Rec. Doc. 2 at 21 (citing *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 623 (5th Cir. 1985); *Hornbeck Offshore Servs., LLC v. Salazar*, 696 F. Supp. 2d 627, 638–39 (E.D. La. 2010)).

[116] *Id.*

[117] *Id.* at 21–22.

[118] *Id.* at 22.

[119] *Id.*

providers, longer patient wait times, and fewer services to an already underserved population.[120]

### 2. Defendants' Arguments in Opposition to Preliminary Injunction

Defendants argue that Jefferson Parish understands the importance of providing health care to the public, as it has established major public hospitals on both the east and west banks of the Mississippi River.[121] However, Defendants contend, Resolutions 127020 and 127051 do not deprive the public of medical care, nor do they prevent JCHCC from providing medical care in Jefferson Parish.[122] According to Defendants, JCHCC purchased a former medical clinic building in Avondale from Hospital Service District No. 1 of Jefferson Parish d/b/a West Jefferson Medical Center on November 14, 2014 for $475,000.[123] Defendants contend that, although JCHCC remains the owner of this building, it does not use the building to offer medical services to the public.[124] Defendants also assert that JCHCC has failed to mention the recent construction and occupation of a $1.5 million facility located at 3932 U.S. Highway 90 on the West Bank of Jefferson Parish, or that JCHCC also maintains another medical facility on the West Bank of Jefferson Parish at 51 Church St. in Lafitte.[125]

Finally, Defendants argue that JCHCC's claim that the resolutions put JCHCC's entire federal grant project at risk is without merit.[126] According to Defendants, JCHCC knew or should

---

[120] *Id.*

[121] Rec. Doc. 12 at 7.

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] *Id.* at 7–8.

[126] *Id.* at 8.

have known the contents of the CEAs prior to their execution, particularly the effective dates of those CEAs.[127] Defendants assert that there is no allegation that they violated the terms of either CEA, yet JCHCC now claims that passing resolutions regarding the conclusions of the CEAs could put JCHCC's grant project at risk, despite not having prepared itself for the effect that the conclusion of the CEAs could have on its federal grant project.[128] Therefore, Defendants argue, JCHCC has not shown a substantial threat of irreparable injury.[129]

## C.    *Balance of the Harms*

### 1.    JCHCC's Arguments in Support of the Preliminary Injunction

JCHCC argues that Defendants will suffer no injury if the Court grants the requested relief, as Jefferson Parish Council continues to seek to lease out its facilities to another health center, free of any rental payment responsibility.[130] As such, JCHCC claims, the Parish would face no financial harm if the injunction is granted and JCHCC remains in the facility until the Court makes a determination on the merits.[131] Additionally, Plaintiff claims, the Parish recently extended to August 4, 2016 the Council's deadline for submissions of statements of qualifications.[132] According to JCHCC, it is very unlikely that the Parish will find a tenant to immediately occupy both buildings and be in a position to provide comprehensive primary healthcare services, and

---

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] Rec. Doc. 2 at 22.

[131] *Id.* at 22–23.

[132] *Id.* at 23.

therefore a preliminary injunction is particularly appropriate in this case as it is necessary to preserve the status quo and maintain access to healthcare services for JCHCC's patients.[133]  On the other hand, Plaintiff avers, without injunctive relief before the end of JCHCC's lease term, any victory by JCHCC in this action would be a pyrrhic one, as there would be a guaranteed gap in services provided to Jefferson Parish's medically underserved community if JCHCC's lease expires.[134]

### 2.      Defendants' Arguments in Opposition to the Preliminary Injunction

In opposition, Defendants contend that granting the preliminary injunction would set a dangerous precedent with potentially disastrous outcomes for Jefferson Parish, as the Parish regularly enters into contractual agreements with effective dates of limited duration.[135]  According to Defendants, granting this preliminary injunction and forcing Jefferson Parish to renew the leases significantly limits the Council's ability to govern and conduct its business by preventing the Council from terminating even those contracts that provide specific termination dates.[136]  Defendants claim that these repercussions would disserve the public interest and that the harm to Defendants would outweigh the harm to Plaintiff if the motion is not granted.[137]

### D.      *Public Interest*

Finally, Plaintiff argues that the public interest factor greatly favors granting relief to

---

[133]  *Id.* (citing *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971)).

[134]  *Id.*

[135]  Rec. Doc. 12 at 8.

[136]  *Id.* at 8–9.

[137]  *Id.*

JCHCC because the relief is consistent with the objectives of Section 330, namely providing access to primary healthcare services to a federally designated, medically underserved population.[138] Defendants contend, as noted above, that the public interest would not be served because granting the preliminary injunction would interfere with Jefferson Parish's ability to govern.[139]

## IV. Analysis

### A.   Substantial Likelihood of Success on the Merits

In its briefing, Plaintiff alleges two causes of action under which it believes it is entitled to relief, and on which it believes it is substantially likely to prevail on the merits: (1) a claim pursuant to 42 U.S.C. § 1983 for Jefferson Parish Council's alleged violation of the Medicaid Act's mandatory FQHC service provision; and (2) an implied private right of action claim under Section 330 of the PHS Act, alleging that the Council's actions are preempted by federal law.[140] Although those are the only claims raised in either Plaintiff's motion or its complaint, at the hearing on the preliminary injunction, Plaintiff presented evidence that Jefferson Parish Council had breached the contract, namely the CEA, between it and JCHCC by failing to give appropriate notice pursuant to Section D(1) of the CEA. The Court will address all three claims, in turn, below.

### 1.   Section 1983

Plaintiff brings a § 1983 claim on behalf of itself, its consumer-based board, and its numerous Medicaid beneficiary patients,[141] alleging that because § 1396a(a)(10) of the Medicaid

---

[138] Rec. Doc. 2 at 23.

[139] Rec. Doc. 12 at 8–9.

[140] Rec. Doc. 2 at 12, 14.

[141] Rec. Doc. 1 at 35.

Act requires all states to provide certain "medical assistance," including FQHCs, and because federal law confers a right upon Medicaid beneficiaries to receive the mandatory FQHC services identified at § 1396d(a)(2)(C), the Parish's resolutions unlawfully deprive JCHCC's Medicaid beneficiaries of their statutory right to receive mandatory FQHC services at JCHCC's Marrero and River Ridge sites.[142]

In support, Plaintiff cites only *Cohen v. Chester County Department of Mental Health Intellectual Disabilities Services*,[143] a non-binding case from the Eastern District of Pennsylvania, in which a Medicaid beneficiary was found to have a private right of action to enforce § 1396a(a)(8) where a state agency allegedly failed to provide certain services guaranteed by the Medicaid Act.[144] In *Cohen*, the district court concluded that "where Congress required states accepting Medicaid funding to provide certain services to the developmentally disabled, 'Congress conferred specific entitlements on individuals in terms that could not be clearer' and are therefore individually enforceable in an action brought under 42 U.S.C. § 1983."[145] In *Cohen*, the court determined that a Medicaid beneficiary had a right to sue numerous defendants for allegedly failing to provide certain medical services guaranteed by the Medicaid Act either with "reasonable promptness" as required by statute or even, in some cases, to provide the services at all.[146] The plaintiff in *Cohen* further alleged that the defendants had violated 42 U.S.C. § 1396n(c), which

---

[142] *Id.*

[143] 2016 WL 3031719 (E.D. Pa. May 24, 2016).

[144] *Id.* at *7–8.

[145] *Id.* at *7.

[146] *Id.* at *8.

requires states operating waiver programs to provide the federal government with "assurances" that "necessary safeguards . . . have been taken to protect the health and welfare of individuals provided services under the waiver." [147]

Although the facts have not been completely developed at this stage of this litigation, because JCHCC's board of directors includes patients who utilize JCHCC's services, it appears that as in *Cohen*, Medicaid beneficiaries will experience a gap in services during which they may not have the same access to Medicaid services as they have had while JCHCC occupies the premises at the Marrero and River Ridge sites. Here, due to the actions of Jefferson Parish Council, as of July 31, 2016, when Plaintiff will be evicted, and because the Parish's request for submissions of statements of qualifications from prospective health care providers drew only one bid (from Plaintiff) that was implicitly rejected by the Council, Plaintiff (or some of its members) will not be able to receive their medical benefits unless they incur the expenses and inconveniences of traveling elsewhere. Whether local government is required to do *something* to mend this gap in services remains an open question, and it was left unanswered by Defendants' failure to put forth any evidence on this matter (or even address the viability of Plaintiff's § 1983 claim in opposition to Plaintiff's motion for a preliminary injunction).[148] It is hard to fathom why Jefferson Parish would choose to do nothing at all and leave empty two facilities that are fully equipped and funded to serve the underserved and impoverished segment of the populations of Marrero and River Ridge

---

[147] *Id.*

[148] *See* Rec. Doc. 12 at 3–7 (failing to even mention Plaintiff's allegations pursuant to § 1983 or its preemption arguments and instead treating the instant matter as a simple breach of contract claim).

rather than allow JCHCC to continue to occupy those premises, at least until another provider is identified.

Moreover, the Fifth Circuit has held that 42 U.S.C. § 1396a(a)(10), which states that "[a] State Plan must provide for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5), (17) and (21) of section 1396d(a) of this title, to all individuals" who meet certain eligibility criteria, is enforceable under § 1983.[149] Cases both within and outside the Fifth Circuit have found possible violations of the Medicaid Act, enforceable via a § 1983 action, in cases involving: a stage agency's failure to provide Medicaid beneficiaries with medical assistance for prescribed disposable incontinence underwear;[150] a state law prohibiting any healthcare provider who performed elective abortion procedures from receiving Medicaid funding;[151] and a state's consideration—contrary to the Medicaid Act's prohibition of states' consideration of spouses' incomes when determining eligibility for Medicaid benefits—of a federally compliant, irrevocable annuity purchased by the spouse of a nursing home resident.[152] In short, the enforcement of the Medicaid Act's provision of services to the poor can run the gamut, requiring or prohibiting a range of actions by states and/or their agencies tasked with enacting and complying with the many provisions of the Medicaid Act.

---

[149] *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 601–07 (5th Cir. 2004).

[150] *Id.* at 603.

[151] *Planned Parenthood Arizona, Inc. v. Betlach*, 922 F. Supp. 2d 858, 864 (D. Ariz.), *aff'd*, 727 F.3d 960 (9th Cir. 2013).

[152] *Geston v. Olson*, 857 F. Supp. 2d 863, 882 (D.N.D. 2012), *aff'd sub nom. Geston v. Anderson*, 729 F.3d 1077 (8th Cir. 2013).

Here, Plaintiff's briefing falls short of drawing a strong thread between its (and its patients') right to receive Medicaid services from FQHCs more generally and JCHCC's right to occupy the facilities at Marrero and River Ridge specifically. The Court is concerned by some of the relief requested by JCHCC, particularly in light of the fact that *Cohen*, the only case cited by JCHCC, is distinguishable from the facts at hand and is not controlling authority. In *Cohen*, as discussed above, a county, a commonwealth, and their employees were alleged to have violated specific portions of the Medicaid Act by denying services for which the plaintiff was undisputedly eligible, including, among other things, maintaining the proper ratio of staff support, providing sufficient behavioral support to control the plaintiff's violent outbursts, providing speech therapy, and keeping the patient's assessments up to date and complete.[153]  By contrast, in this case, JCHCC alleges that because the Medicaid Act requires FQHC services to be provided, any act by a state or local government that would "unlawfully" interfere with or restrict a FQHC's ability to provide those services illegally infringes on a beneficiary's right to receive those services.[154]

Accordingly, JCHCC is asking the Court to conclude that JCHCC is likely to prevail in proving that the Medicaid Act requires the Parish not only to comply with the contracts it already has in place to provide federally funded medical services to Medicaid beneficiaries, but that the Medicaid Act actually requires local governments to *create* contracts that would further such goals. However extreme Plaintiff's request may seem, such request is being made in the context of uncontroverted allegations of intimidation and improper influence with the JCHCC's operations

---

[153] *Cohen*, 2016 WL 3031719, at *8.

[154] Rec. Doc. 2 at 13.

by a Parish councilman, and of Jefferson Parish choosing to leave buildings vacant and needs unmet, at least for the time being. Furthermore, Plaintiff implies that not only must Jefferson Parish provide the Marrero and River Ridge facilities to JCHCC (or perhaps some other FQHC) in order to comply with the Medicaid Act, but that, moreover, the Parish may even violate federal law unless it offers lease terms for periods longer than 30 days because it is difficult to provide adequate healthcare services under the uncertain conditions presented in a month-to-month arrangement.

While it appears at this early juncture and in light of the limited briefing provided thus far that JCHCC's arguments may stretch the limits of § 1983 relief, the Court cannot conclude that "there is *no chance* that the movant will eventually prevail on the merits."[155] Although Plaintiff's briefing fails to fully grapple with the complexity of the issues it presents, motions for preliminary injunctions are by nature hasty proceedings, and for that reason, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."[156] Here, although the Court leaves for a later time some of the complex legal issues raised by Plaintiff's § 1983 argument, it appears clear that the Fifth Circuit has affirmed the right of Medicaid beneficiaries to pursue § 1983 actions to enforce 42 U.S.C. § 1396a(a)(10), and that such actions can often lead to success on the merits for the plaintiffs bringing such claims.[157]

---

[155] *State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975) (emphasis added).

[156] *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

[157] *See, e.g.*, *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 603 (5th Cir. 2004) (concluding that a state agency violated the Medicaid Act by failing to provide beneficiaries with medical assistance for prescribed disposable incontinence underwear); *Markva v. Haveman*, 168 F. Supp. 2d 695, 712 (E.D. Mich. 2001), *aff'd*, 317 F.3d 547 (6th Cir. 2003) (concluding that a state's failure to treat grandparents the same way as parents in calculating eligibility for and amount of benefits violated Medicaid statutes); *M.T. v. Gargano*, 781 F. Supp. 2d 798, 808 (S.D. Ind. 2011) (concluding that the Indiana Medicaid program was required by a provision of the Medicaid Act to consider the

Therefore, although JCHCC has not shown that the Medicaid Act binds Jefferson Parish to a relationship with JCHCC, there is some authority to suggest that Plaintiff could ultimately prevail on a claim the Parish may not leave buildings vacant and deprive Medicaid recipients of their right to have accessible medical services. Accordingly, at this stage the Court concludes that Plaintiff has made some showing of a substantial likelihood of success on the merits of its § 1983 claim.

### 2.    Preemption Pursuant to Section 330 of the PHS Act

Next, Plaintiff urges the Court to conclude that, even if it is not entitled to relief under § 1983, JCHCC has a substantial likelihood of prevailing on the merits of its argument that the Council's resolutions are preempted by Section 330 of the PHS Act and its implementing regulations.[158] Section 330 of the PHS Act makes federal funding available to qualified health centers that provide primary healthcare services to medically underserved populations.[159] An entity becomes eligible for Section 330 grant funds by submitting an application to HRSA. In addition to establishing that the entity provides health care to a medically underserved population area, the entity must satisfy a number of additional requirements.[160] For example, a qualified entity must be able to demonstrate its financial responsibility,[161] and must establish a governing board

---

potential for regression prior to denying disabled minors therapies to maintain a level of functionality).

[158] Rec. Doc. 2 at 14.

[159] 42 U.S.C. § 254b.

[160] *See id*. § 254b(k)(3).

[161] *Id.* § 254b(k)(3)(D).

composed of a majority of individuals who are being served by the health center.[162] Entities that satisfy these requirements and receive Section 330 grant funds are designated FQHCs.

Plaintiff admitted at the hearing on the motion for the preliminary injunction that it knew of no statute or case law expressly establishing that a Section 330 grantee has a right to bring a private cause of action to allege that certain state action must be enjoined because it is preempted by Section 330. "Preemption" is not a stand-alone cause of action—an argument that state law is preempted by federal law draws its power from the Constitution's Supremacy Clause,[163] which states that:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.[164]

In 2014, the Fifth Circuit concluded that the Supremacy Clause created an implied private cause of action itself in the absence of a statutory provision expressly creating one.[165] There, the Fifth Circuit held that, in light of earlier binding Fifth Circuit precedent, pursuant to the Supremacy Clause, "when a state violates the federal requirements of the Medicaid Act, a private plaintiff can

---

[162] *Id.* § 254b(k)(3)(H).

[163] *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152 (1982) (noting that preemption doctrine "has its roots in the Supremacy Clause"); *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317 (1981) (attributing "[t]he underlying rationale of the preemption doctrine" to the Supremacy Clause); Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 234 (2000) ("As the Supreme Court and virtually all commentators have acknowledged, the Supremacy Clause is the reason that valid federal statutes trump state law.") (footnotes omitted).

[164] U.S. Const. art. VI, cl. 2.

[165] *Detgen ex rel. Detgen v. Janek*, 752 F.3d 627, 630 (5th Cir. 2014).

sue the state to enforce those requirements."[166]  In its analysis, however, the Fifth Circuit explicitly held that it was bound by earlier Circuit precedent, particularly in light of the fact that the U.S. Supreme Court had, in the 2012 case of *Douglas v. Independent Living Center of Southern California, Inc.*,[167] dodged the question of whether the Supremacy Clause can by its own power imply a private right of action to enforce federal law.[168]

However, the U.S. Supreme Court has not remained silent on this issue. In 2015, the Supreme Court held in *Armstrong v. Exceptional Child Center, Inc.* that it is "apparent that the Supremacy Clause is not the 'source of any federal rights,' and certainly does not create a cause of action. It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so."[169] The Supreme Court held that although judges have, in utilizing their equitable powers, allowed plaintiffs to sue to enjoin unconstitutional actions by state and federal officials, such powers are not derived from the Supremacy Clause.[170] Accordingly, the Court held, Medicaid providers cannot sue to enforce § 30(A) of the Medicaid Act pursuant to an implied private right of action under the Supremacy Clause.[171] Although the Supreme Court in *Armstrong* decided a case involving the Medicaid Act, its reasoning that a private actor cannot sue in court to enforce federal

---

[166] *Id.* at 631.

[167] 132 S. Ct. 1204, 1211 (2012) (remanding to the Ninth Circuit to determine whether a plaintiff could bring a Supremacy Clause cause of action to enforce a federal statute).

[168] *Detgen ex rel. Detgen*, 752 F.3d at 630.

[169] 135 S. Ct. 1378, 1383 (2015) (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)).

[170] *Id.* at 1384.

[171] *Id.* at 1385.

law pursuant to the Supremacy Clause appears to equally guide this Court's analysis of whether Section 330 of the PHS Act would allow a private actor to bring a cause of action in federal court to enjoin a state or local law from taking effect. Clearly, it does not.

Instead, although Plaintiff did not acknowledge *Armstrong* in either its briefing or at the preliminary injunction hearing, Plaintiff appears to allege that it is not really a "private" actor for the purposes of this litigation, but is instead a federal entity that has an enforceable right to prevent the unlawful encroachment of local government on its activities. Thus, Plaintiff's memorandum in support of its motion for a preliminary injunction and its argument at the preliminary injunction hearing rested on its claim that JCHCC is, "[a]t its essence, . . . an instrument of the federal government,"[172] akin to the National Railroad Passenger Corporation, also known as Amtrak, as recently determined by the Supreme Court in *Department of Transportation v. Association of American Railroads.*[173] Plaintiff, at the preliminary injunction hearing, acknowledged that not every federal grantee should be considered a federal entity merely because it receives federal funding, but argued that Section 330 health care centers are unique and fit squarely into the Supreme Court's analysis in *Association of American Railroads*.

As evidence, JCHCC cites the following considerations: (1) JCHCC's status as a federal grantee, and designation as a FQHC, is a creation of Congress;[174] (2) its existence and ability to function is entirely dependent on federal grant funding; (3) JCHCC is subject to federally mandated obligations; (4) JCHCC enjoys certain federal rights and benefits, including an

---

[172] Rec. Doc. 2 at 15.

[173] 135 S. Ct. 1225 (2015).

[174] 42 U.S.C. § 254b.

enforceable right to receive 100 percent of its reasonable costs in furnishing services to Medicaid and Medicare beneficiaries; (5) Section 330 health centers and their employees, board members, and officers are deemed to be federal employees of the Public Health Service and afforded statutory immunity for malpractice claims;[175] and (6) JCHCC is heavily regulated and monitored by HRSA.[176] JCHCC argues that, considering that the government creates FQHCs, defines JCHCC's mission, specifies many of JCHCC's day-to-day operations, and sets and monitors the scope of JCHCC's Section 330 project, including its annual budget for carrying out its grant project, it is a federal entity and "is—for purposes of this action to safeguard its federal grant project—necessarily acting as or on behalf of its grantor agency."[177] Thus, JCHCC contends, particularly in light of the fact that it is also a trustee of federal funds, it has the characteristics of a federal instrumentality, even though it is not explicitly designated as such under the law.[178]

The Court is not convinced given the record before it by the analogy that JCHCC attempts to create between itself and Amtrak. In *Department of Transportation v. Association of American Railroads*, the U.S. Supreme Court held that despite statutory declarations that Amtrak "shall be operated and managed as a for profit corporation" and "is not a department, agency, or instrumentality of the United States Government," it was nevertheless a federal, rather than a private, entity for the purpose of the constitutional question before the Court regarding the

---

[175] 42 U.S.C. § 233(a) and (g); *Hui v. Castenada*, 559 U.S. 799 (2010).

[176] Rec. Doc. 2 at 15–16.

[177] *Id.* at 16.

[178] *Id.* at 17 (citing *Dep't of Transp. v. Ass'n of Am. R.R.s*, 136 S. Ct. 1225 (2015); *Neukirchen v. Wood Cty. Head Start, Inc.*, 53 F.3d 809, 812–14 (7th Cir. 1995)).

delegation of legislative powers.[179] The Amtrak decision rested on certain key considerations. First, the Supreme Court noted that Amtrak has a distinctive ownership and corporate structure.[180] Specifically, on Amtrak's board of directors sits the Secretary of Transportation, who also holds most of Amtrak's stock, and seven other members appointed by the President, confirmed by the Senate, and removable by the President without cause.[181] The Supreme Court also noted that the political branches "exercise substantial, statutorily mandated supervision over Amtrak's priorities and operations."[182] For example, Amtrak must submit numerous annual reports to Congress and the President, detailing information such as route-specific ridership and on-time performance; it is subject to the Freedom of Information Act in any year in which it receives a federal subsidy; and it is a "designated federal entity" under the Inspector General Act of 1978 and must maintain an inspector general, much like governmental agencies such as the Federal Communications Commission and the Securities and Exchange Commission.[183] Furthermore, Amtrak is subject to frequent Congressional oversight hearings into its budget, routes, and prices, and, "rather than

---

[179] *Ass'n of Am. R.R.s*, 136 S. Ct. at 1231.

[180] *Id.*

[181] *Id.* The ninth board member, who also serves as Amtrak's president, is chosen by the other eight. In addition, Presidential appointees to Amtrak's board must also have experience in the transportation industry, and must represent the major geographic regions served by Amtrak. Furthermore, no more than five of the seven appointees may be from the same political party. *See* Case Comment, *Passenger Rail Investment and Improvement Act-Nondelegation*-Department of Transportation v. Association of American Railroads, 129 Harv. L. Rev. 341, 343 (2015).

[182] *Ass'n of Am. R.R.s*, 136 S. Ct. at 1232.

[183] *Id.*

advancing its own private economic interests, Amtrak is required to pursue numerous, additional goals defined by statute."[184]  Finally, Amtrak depends heavily on federal subsidies.[185]

Although there are some distinct parallels between Section 330 health care centers and Amtrak, such as the importance of federal funding and the allegedly significant amount of federal oversight over JCHCC's actions, the Court declines to conclude that JCHCC is substantially likely to prevail on the merits of its argument that it is a federal entity akin to Amtrak for the purposes of maintaining a private right of action against Defendants pursuant to the Supremacy Clause.

If JCHCC cannot meet its burden of proving that it can bring an enforceable private right of action pursuant to Section 330 of the PHS Act in this matter, the Court need not consider the merits of JCHCC's arguments that the Council's resolutions "are patently unlawful and impair JCHCC's ability to carry out its federal grant project."[186]  However, because many of the issues in this case overlap and rest on the same factual predicate, the Court takes this opportunity to note several additional flaws in JCHCC's argument.

For instance, JCHCC, at the hearing on the preliminary injunction, analogized the Jefferson Parish Council to a federal agency subject to the requirements of the Administrative Procedure Act, and argued that its failure to articulate reasons for passing Resolutions 127051 and 127020 amounted to "arbitrary and capricious" behavior requiring this Court to intervene and enjoin the enforcement of such laws. Plaintiff, however, incorrectly mistakes the Parish Council for an

---

[184] *Id.*

[185] *Id.*

[186] Rec. Doc. 2 at 17.

36

agency when it is in fact a legislative body.[187] Although local governments may, in limited circumstances, be subject to substantive due process challenges if they act utterly without a rational basis,[188] such challenges are very difficult to win,[189] and nevertheless no such claim has been made in this litigation. Therefore, the Court cannot enjoin the enforcement of the Parish Council's resolutions on the basis that the Council did not arrive at its decision pursuant to the same rigors and review required of federal agencies under the Administrative Procedure Act.

JCHCC also argues that the Council's actions were patently unlawful because Councilman Spears' attempts to interfere with JCHCC's authority would, had JCHCC acquiesced, have violated federal law.[190] Specifically, JCHCC alleges that Councilman Spears attempted to: (1) coerce JCHCC to cease the implementation of its corrective action plan by sending Dr. Williams a fax purporting to terminate its lease early; (2) encroach on JCHCC's board of director's exclusive authority to hire and fire the CEO and otherwise establish policies and procedures for the health center's personnel decisions; (3) influence JCHCC's vendor selection contrary to federal

---

[187] *Schmidt v. Par. of Jefferson*, No. 99-0153, 1999 WL 550207, at *3 (E.D. La. July 27, 1999). In *Bogan v. Scott-Harris*, the U.S. Supreme Court recognized that, for purposes of determining whether legislative immunity should attach to the actions of a government official, courts must conduct an analysis of whether the official's acts were legislative or administrative in nature. 523 U.S. 44, 54 (1998). However, because neither party briefed this issue for the Court, the Court declines here to conclude that, in contrast to its usual functions, Jefferson Parish Council was not acting as a legislative body when it passed Resolutions 127051 and 127020.

[188] *See, e.g.*, *Baker v. St. Bernard Par. Council*, No. 08-1303, 2008 WL 4681373, at *9 (E.D. La. Oct. 21, 2008); *FM Properties Operating Co. v. City of Austin*, 93 F.3d 167, 174 (5th Cir. 1996).

[189] *See Shelton v. City of Coll. Station*, 780 F.2d 475, 477 (5th Cir. 1986) (holding, in a case reviewing a municipal zoning ordinance, that "[i]n the absence of invidious discrimination, suspect classifying criteria, or infringement of fundamental interests, our review of these quasi-legislative decisions is confined to whether the decisions were 'arbitrary and capricious'"). The Fifth Circuit in *Shelton* clarified, however, that the "arbitrary and capricious" standard for a substantive due process claim is "distinguished from its quite different meaning under certain state laws and under the federal Administrative Procedure Act," as a zoning decision will be upheld so long as "there was any conceivable rational basis" for it. *Id.*

[190] Rec. Doc. 2 at 18.

procurement laws; and (4) interfere with JCHCC's collection of payments made to JCHCC's former CEO and attorney.[191]

Plaintiff bears the burden of proof at this stage. Defendants presented no witnesses at the hearing on the preliminary injunction, and the Court therefore at this point has only the uncontroverted testimony of Dr. Shondra Williams and Thaddeus Thomas Valentine, two witnesses who swore under oath that Councilman Spears attempted to influence and interfere with JCHCC's operations in the manner alleged by Plaintiff. However, the interference with JCHCC's operations by Councilman Spears alleged by Plaintiff in its complaint, motion, and the testimony of witnesses—and uncontroverted by Defendants in the hearing on the preliminary injunction— are not the actions Plaintiff now seeks to enjoin. Specifically, JCHCC does not seek to enjoin Councilman Spears from violating the PHS Act's requirements. Instead, JCHCC seeks to enjoin the implementation of two laws, passed unanimously by the full body of the Jefferson Parish Council, and not solely Councilman Spears, severing JCHCC's right to remain in the Marrero and River Ridge locations currently leased from Jefferson Parish.

It is undisputed that both CEAs expire by their own terms if Jefferson Parish gives sufficient notice to JCHCC.[192] Therefore, even if all of Councilman Spears' allegedly unlawful acts were capable of being enjoined, and even if the Court were to believe that the Parish Council passed Resolutions 127051 and 127020 primarily for retaliatory reasons, the Council's actions of passing an ordinance to terminate the CEAs at a time contemplated by the terms of the CEAs

---

[191] *Id.*

[192] The Court concludes below, *infra* Part IV(A)(3), that the Parish did give sufficient notice to JCHCC.

themselves are not, in and of themselves, unlawful pursuant to the PHS Act. Accordingly, the

Court cannot conclude that Plaintiff, even in light of the uncontroverted evidence that Councilman

Spears at the very least attempted to overstep into the internal affairs of the JCHCC, has established

a substantial likelihood of success on its claim that Resolutions 127051 and 127020 are preempted

by federal law.

### 3.     Breach of Contract

At the hearing on the preliminary injunction, Plaintiff presented evidence that Jefferson

Parish failed to properly notify it, as required by the terms of the CEA, of its intent not to renew

the CEA. Accordingly, the Court shall herein address whether Plaintiff has met its burden of

showing a substantial likelihood of success on a breach of contract claim.

Plaintiff alleged during the hearing that Jefferson Parish did not comply with Section D(1)

of the CEA because it did not provide written notice to JCHCC until July 2nd or 3rd, the date on

which Dr. Shondra Williams received via certified mail a letter from Jefferson Parish attorney

Michael J. Power attaching Resolution 127051, adopted May 11, 2016, and stating that Jefferson

Parish had chosen not to renew the Marrero CEA.[193] Plaintiff alleges that any earlier notice was

insufficient because a Louisiana law—not specified—requires notice to tenants to be sent via

certified mail, and no previous notice was sent to JCHCC by certified mail. The Court can find no

such Louisiana law. By contrast, Louisiana Code of Civil Procedure article 4701 states that:

> When a lessee's right of occupancy has ceased because of the termination of the
> lease by expiration of its term, action by the lessor, nonpayment of rent, or for any
> other reason, and the lessor wishes to obtain possession of the premises, the lessor

---

[193] *See* Prelim. Inj. Ex. F at 1. The Court cannot ascertain based on the faded stamp the date on which Dr.
Williams received the letter at issue, but it appears undisputed that the letter, dated June 27, 2016, was received on
either July 2 or 3, 2016. *See id.* at 3.

> or his agent shall cause written notice to vacate the premises to be delivered to the lessee. The notice shall allow the lessee not less than five days from the date of its delivery to vacate the leased premises. . . . If the lease has a definite term, notice to vacate may be given not more than thirty days before the expiration of the term. A lessee may waive the notice requirements of this Article by written waiver contained in the lease, in which case, upon termination of the lessee's right of occupancy for any reason, the lessor or his agent may immediately institute eviction proceedings in accordance with Chapter 2 of Title XI of the Louisiana Code of Civil Procedure.

Accordingly, Louisiana law appears to recognize that a written agreement between a lessor and a lessee can waive notice requirements otherwise provided for by law.

Here, the CEA provides only that the CEA would automatically renew "unless any of the parties notify the other parties in writing of its intent not to renew at least 60 days prior to the expiration of the term then in effect;"[194] no mention of certified mail is made anywhere in the contract. Moreover, Dr. Williams testified that the first written notice she received from Jefferson Parish regarding an intent not to renew the lease was a letter with a subject line reading "Notice of Termination: Cooperative Endeavor Agreement for the use of 1855 Ames Blvd., Marrero, Louisiana dated August 1, 2006," dated April 14, 2016, and addressed to Dr. Williams at her office address in Marrero.[195] That letter states that Jefferson Parish desires alternative lease terms, on a month-to-month basis and requiring JCHCC to pay a pro-rata share of utility bills.[196] Therefore, it is a clear indication that Jefferson Parish did not wish to renew the terms of the CEA for an additional five-year term. Although Dr. Williams testified regarding a number of other events that she alleged shed light on the letter, the Court concludes that the April 14, 2016 letter to Dr.

---

[194] Prelim. Inj. Ex. A at 6.

[195] *See* Prelim. Inj. Ex. B at 1.

[196] *Id.*

Williams constituted "written notice" to JCHCC in compliance with the terms of the CEA. As such, JCHCC has not shown a substantial likelihood of success on the merits of any breach of contract claim it may wish to maintain against Defendants on the basis that they allegedly failed to provide JCHCC with appropriate written notice pursuant to the CEA.

### 4.    Conclusion

Although the Court has concluded, above, that Plaintiff has not met its burden of showing a substantial likelihood of success on its preemption or breach of contract claims, Plaintiff need not prevail on all of its causes of action in order to obtain a preliminary injunction. Moreover, although the Court acknowledges the extraordinary nature of JCHCC's claim pursuant to § 1983, the Fifth Circuit has held that a plaintiff's showing on this first prong need not be especially strong in order to warrant a preliminary injunction, particularly when balanced against a strong showing on the other factors that a plaintiff must prove in order to obtain a preliminary injunction. For example, in *State of Texas v. Seatrain International, S.A.*, the Fifth Circuit explained:

> No matter how severe and irreparable an injury one seeking a preliminary injunction may suffer in its absence, the injunction should never issue if there is *no chance* that the movant will eventually prevail on the merits. . . . Obviously, it is inequitable to temporarily enjoin a party from undertaking activity which he has a clear right to pursue. However, one appealing to the conscience of the chancellor to maintain the status quo pending final decision, although he carries a burden, *is not required to prove to a moral certainty that his is the only correct position*. The prerequisite, as an absolute, is more negative than positive: one cannot obtain a preliminary injunction if he clearly will not prevail on the merits; however, that he is unable, in an abbreviated proceeding, to prove with certainty eventual success does not foreclose the possibility that temporary restraint may be appropriate. In its negative sense, the factor is critical; but viewed positively, the importance and nature of the requirement can vary significantly, depending upon the magnitude of the injury which would be suffered by the movant in the absence of interlocutory

relief and the relative balance of the threatened hardship faced by each of the parties.[197]

Here, the Court does not find that there is "no chance" that Plaintiff will eventually prevail, particularly in light of the briefing at this juncture of the proceedings and the fact that no discovery has been conducted. Accordingly, the Court concludes that Plaintiff has met its burden at this stage concerning the substantial likelihood of success on the merits of its § 1983 claim.

## B.    *Substantial Threat of Irreparable Harm*

Plaintiff argues that it will suffer irreparable harm absent injunctive relief because, if JCHCC is not allowed to remain in the Marrero and River Ridge facilities pending a resolution on the merits of this matter, its patients will be deprived of medical care. Plaintiff contends that the federal government has designated the area and population served by JCHCC at those locations to be "medically underserved."[198] JCHCC asserts that the resolutions would disrupt the care to thousands of patients, many of whom suffer from chronic diseases, by effectively terminating their primary care provider relationships and resurrecting a barrier to health care that JCHCC's grant project sought to eliminate.[199] In addition, Plaintiff claims, if JCHCC is not permitted to stay in the Marrero facility, its entire federal grant project will be at risk because the Marrero Clinic provides administrative and financial support to JCHCC's other three facilities.[200] Defendants respond that JCHCC's concerns are exaggerated, given that JCHCC has purchased other facilities

---

[197] 518 F.2d 175, 180 (5th Cir. 1975) (emphasis added).

[198] Rec. Doc. 2 at 21.

[199] *Id.* at 21–22.

[200] *Id.*

within Jefferson Parish from which it can operate, and therefore JCHCC can continue to provide services to its patients.[201] Furthermore, Defendants contend, Plaintiff's patients can also seek medical treatment elsewhere.[202]

At the hearing, Dr. Shondra Williams testified that although JCHCC had indeed found another Marrero location from which it could operate, the new location would be approximately two miles away from the current Marrero location and that it was "by no stretch of the imagination a substitute for the 1855 Ames Blvd. address" based on its size, its location, and the fact that it had not, unlike JCHCC's current location, had more than $1.5 million in federal funds poured into it.[203] Dr. Williams also testified that this facility is still awaiting approvals from the Parish regarding necessary permits. Moreover, she testified, no adequate substitute had yet been located for the River Ridge facility.[204] According to Dr. Williams' unrebutted testimony, even moving the current Marrero location could cause irreparable harm because a difference of two miles can make a vast difference to the communities served by JCHCC.[205] Dr. Williams testified that many of JCHCC's patients arrive by foot or bicycle, and that public transportation services in the area are insufficient.[206] Therefore, she stated, it was doubtful that JCHCC's patients could actually relocate

---

[201] *Id.*

[202] Rec. Doc. 12 at 7–8.

[203] Prelim. Inj. Test. of Dr. Shondra Williams.

[204] *Id.*

[205] *Id.*

[206] *Id.*

to a new facility, and that it was for this reason, among others, that Section 330 grants are given on a site-specific basis.[207]

In response, Defendants presented no evidence to rebut Dr. Williams' testimony that any alternate medical facilities that JCHCC may occupy would not be sufficient to meet the needs of JCHCC's clientele and would be less accessible than the current Marrero and River Ridge locations. Nor did Defendants adequately address JCHCC's claim that any alternate facilities will not be able to be up and running by August 1, 2016. As noted above, JCHCC is awaiting the approval of certain necessary permits to operate an alternative location in the vicinity of the Marrero facility, and moreover, such a facility will require additional refurbishing before it is capable of providing medical services to the poor. Instead, counsel for Defendants opined at the hearing that, given counsel's experience living on the West Bank, it would cause little trouble for any clientele currently located in Marrero to travel the additional 7 miles between JCHCC's location at 1855 Ames Blvd. in Marrero to its Avondale facilities located at 3932 U.S. Highway 90. According to Defendants, even without the use of JCHCC's recently acquired, additional facilities, its other locations operating throughout Jefferson Parish should be able to adequately meet the needs of any patients currently served in Marrero or River Ridge.[208]

Although Defendants accused Plaintiff of merely "speculating" and "assuming" that the patients served by JCHCC, with whom testifying witnesses Dr. Williams and Thaddeus Valentine are presumably familiar, cannot easily transport themselves to one of JCHCC's other locations to

---

[207] *Id.*

[208] Counsel for Defendants stated, "No evidence was put forth that their patients cannot get to Avondale from Marrero. I live on the West Bank. Avondale is not that far from Marrero. It can be done."

continue to receive the services they seek, the Court finds Defendants' claims both uncompelling and offensive. Defendants' allegation that JCHCC's patients could be absorbed by other facilities elsewhere in Jefferson Parish flies in the face of the fact that the federal government has, by virtue of allocating funds to JCHCC's Marrero and River Ridge locations through 2017,[209] already deemed those areas and populations to be "medically underserved" by existing facilities. Furthermore, according to the uncontroverted testimony presented during the preliminary injunction hearing, JCHCC as a whole serves approximately 15,000 patients annually, and the Marrero location alone provides services to approximately 8,000 patients annually.[210] Moreover, by definition the population is largely poor; according to an affidavit submitted by Dr. Williams with the complaint in this matter, incorporated by reference in Plaintiff's motion for a preliminary injunction, 53% of JCHCC's target population has a household income below 200% of the federal poverty level, and nearly 42% is uninsured.[211]

Given these facts, the Parish's assertion that it "understands the importance of providing health care to the public" is belied by Defendants' simultaneous argument that it would cause no irreparable harm to reduce the number of available facilities to serve the poor, without any indication that another medical provider is ready or willing to immediately take over the spaces once they are vacated on July 31, 2016.[212] Other courts have concluded that a disruption to patients' health care can create an irreparable harm that cannot be remedied by money damages or

---

[209] Prelim. Inj. Test. of Dr. Shondra Williams.

[210] Prelim. Inj. Test. of Dr. Shondra Williams; Rec. Doc. 1-2 at 4.

[211] Rec. Doc. 1-2 at 3.

[212] Rec. Doc. 12 at 7.

a final judgment.[213] Defendants' stated belief that it will not cause irreparable harm to allow the Marrero and River Ridge facilities to remain vacant rather than to continue to lease them to JCHCC, at least while the Parish seeks a replacement, defies common sense.

The actions of the Jefferson Parish Council—namely leaving a health care center vacant and a poor, underserved community without adequate healthcare services for any amount of time—can and will have consequences that are only too easy to imagine. Children with insufficient access to health care are less likely to be in good physical health and miss more days of school due to illness.[214] The elderly in poor communities die younger,[215] and their loss to the community deprives those communities of mentors and caretakers. Adults with chronic, untreated health conditions often miss work and are less productive employees, if they are not entirely prevented from working due to their conditions.[216] To turn a blind eye to the repercussions of the Council's actions here is insensitive and inappropriate, particularly at a time when the public at large demands more from its local, state, and national governments, and is often left sorely disappointed. Accordingly, the Court concludes that Plaintiff has met its burden of establishing a substantial likelihood of irreparable harm.

## C.    *Balance of Harms and Service of the Public Interest*

Finally, in order to obtain a preliminary injunction, Plaintiff must also establish that its

---

[213] *See, e.g.*, *Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 649 (M.D. La. 2015); *Camacho v. Texas Workforce Comm'n*, 326 F. Supp. 2d 794, 802 (W.D. Tex. 2004).

[214] *See* U.S. Dep't of Health and Human Servs., Health Res. & Servs. Admin., *The Health and Well-Being of Children: A Portrait of States and the Nation 2007* 5 (2009).

[215] *See* Eileen M. Crimmins et al., *Poverty and Biological Risk: The Earlier "Aging" of the Poor*, 64A(2) J. Gerontology Series A: Biological Scis. & Med. Scis. 286–92 (2009).

[216] *See* Karen Davis et al., Commonwealth Fund, *Health and Productivity Among U.S. Workers* 2–3 (2005).

substantial injury outweighs the threatened harm to the party whom it seeks to enjoin and that granting the preliminary injunction will not disserve the public interest. This requires a balancing of harms to the parties, which involves an evaluation of the severity of the impact on the defendant should the temporary injunction be granted and the hardship that would occur to the plaintiff if the injunction should be denied.[217]  In addition, the Court must consider whether an injunction would injure the public interest.

Regarding these two factors, JCHCC argues that the defendants will suffer no injury if the Court grants the requested relief, as Jefferson Parish Council continues to seek to lease out its facilities to another health center, free of any rental payment responsibility, and therefore JCHCC's continued presence in those locations pending a trial on the merits would cause the Parish no financial harm.[218]  Additionally, according to JCHCC, it is very unlikely that the Parish will find a tenant to immediately occupy both buildings and be in a position to provide comprehensive primary healthcare services, and therefore a preliminary injunction is particularly appropriate in this case as it is necessary to preserve the status quo and maintain access to healthcare services for JCHCC's patients.[219]  Therefore, JCHCC contends, the balance of the harms and the public interest factor both favor granting relief to JCHCC, as doing so would provide access to primary health care services to a federally designated, medically underserved population.[220]  In opposition,

---

[217] *Monumental Task Comm., Inc v. Foxx*, No. 15-6905, 2016 WL 311822, at *23 (E.D. La. Jan. 26, 2016) (Barbier, J.).

[218] Rec. Doc. 2 at 22.

[219] *Id.* (citing *Exhibitors Poster Exchange, Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971)).

[220] *Id.* at 23.

Defendants contend that granting this preliminary injunction and forcing Jefferson Parish to renew the leases significantly limits the Council's ability to govern and conduct its business by preventing the Council from terminating even those contracts that provide specific termination dates.[221] According to Defendants, the interference with the Council's ability to govern would disserve the public interest and harms Defendants more than it would harm Plaintiff to deny the injunction.[222]

Here, both sides have asserted cognizable harms. On the one hand, a gap of services at the Marrero and River Ridge facilities creates an irreparable harm as outlined above. On the other hand, the Fifth Circuit has held that "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws"[223]—a sentiment that likely extends to Parishes and the enforcement of their laws. Ironically, however, Defendants presented no evidence to shed any light on the Parish's possible motivations in passing resolutions that would effectively deprive communities of unquestionably necessary healthcare services, and in fact stated that because the Parish Council has legislative immunity, they were not required to do so.[224]

Defendants have likewise failed to rebut Dr. Williams' or Valentine's testimony suggesting a long history of attempted interference in JCHCC's affairs by Councilman Spears and his intimidation of its members. In fact, at the hearing on the preliminary injunction, Plaintiff submitted as evidence of Councilman Spears' tactics an e-mail sent to a member of the JCHCC

---

[221] Rec. Doc. 12 at 8–9.

[222] *Id.* at 9.

[223] *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013).

[224] Defendants made this statement at the hearing on the motion for a preliminary injunction, but did not provide any context or authority for this broad statement.

board on July 19, 2016, after JCHCC filed the complaint in this matter.[225]  In that e-mail, sent to

Brian F. Davis, a member of JCHCC's board of directors, Councilman Spears—although a

defendant in these proceedings and represented by counsel—stated:

> It is unfortunate that this organization has decided to make these false, misleading,
> lies about the Parish Council and myself. I will consult with my attorney to seek
> legal action against all parties involved.[226]

In her testimony at the hearing, Dr. Shondra Williams stated that she perceived the e-mail to be a

threat to seek legal action in retaliation for filing the instant lawsuit.[227]

Moreover, at the hearing, Thaddeus Valentine testified that at the April 20, 2016 Council

meeting in which the Council first took up the resolutions at issue in this case, after the four-hour

executive session from which Councilman Spears failed to return, Valentine asked where his

councilman had gone, to which the president of the Council responded that they did not know.[228]

Shortly thereafter, Valentine testified, he received a call from an assistant to Councilman Spears,

who informed Valentine that Councilman Spears had felt disrespected by Valentine's comment.[229]

According to Valentine, he responded that he did not believe he was being disrespectful by simply

inquiring about the whereabouts of his Council member during a Council meeting, but if he had

been, he would apologize to him fully at the next Council meeting.[230]  In addition to the numerous

---

[225] Prelim. Inj. Ex. 7 at 1.

[226] *Id.*

[227] Prelim. Inj. Test. of Dr. Shondra Williams.

[228] Prelim. Inj. Test. of Thaddeus Marks.

[229] *Id.*

[230] *Id.*

allegations of interference by Councilman Spears recounted elsewhere, Councilman Spears' e-mail and Valentine's uncontroverted testimony illustrate, at the very least, the pattern of pettiness and bullying by Councilman Spears complained of by Plaintiff.

Nor have Defendants presented any possible rational explanation for the Council's preference that the Marrero and River Ridge facilities lie vacant while the Parish seeks a new occupant of the facilities and service provider, rather than continue to work with JCHCC as it currently occupies those spaces, until the Parish finds a replacement. Accordingly, because the Court is presented with no other evidence or explanation, it must accept Plaintiff's testimony that the Council's actions are best explained as motivated by Councilman Spears' desire to retaliate against JCHCC for failing to, among other things: (1) cease the implementation of its corrective action plan; (2) allow Councilman Spears to encroach on JCHCC's board of director's exclusive authority to hire and fire the CEO, the CFO, and an attorney; (3) let Councilman Spears influence JCHCC's vendor selection contrary to federal procurement laws; and (4) interfere with JCHCC's collection of payments made to JCHCC's former CEO and attorney. That such pettiness could lie behind the Council's motivation to deprive communities that are already starved for resources of access to health care, and that Defendants could argue with no hint of irony that such a deprivation would benefit the public, is disturbing.

Although the Parish Council and presumably the public have an interest in the enforcement of its laws, in the absence of any evidence of the interest that Jefferson Parish Council wished to serve by evicting JCHCC even while the Council seeks an alternate occupant of the medically outfitted buildings that will remain vacant, the Court concludes that on the whole, the balance of hardships weighs in favor of granting the preliminary injunction. Likewise, the Court cannot

conclude that the public interest would be better served by allowing the Marrero and River Ridge facilities to lie vacant while Jefferson Parish seeks a medical provider—any medical provider besides JCHCC, it appears—to fill the space.

### D.      Whether Plaintiff is Entitled to a Preliminary Injunction

Considering the four factors above, the Court has concluded that although Plaintiff has not shown a substantial likelihood of success on its preemption or breach of contract claims, it has met the Fifth Circuit's standard for establishing a substantial likelihood of success on its § 1983 claim, and has clearly met its burden of persuasion regarding the substantial threat of irreparable harm, the balance of the hardships, and the service of the public interest. Here, the Court determines whether, weighing the factors against one another, Plaintiff has met its burden of persuading the Court that a preliminary injunction is warranted in this matter.[231]

At this stage, it appears that while Plaintiff may succeed in its argument that the Medicaid beneficiaries in the vicinity of the Marrero and River Ridge facilities are entitled to some level of healthcare services that will not be met should those facilities be allowed to remain vacant, Plaintiff has not necessarily shown that it is substantially likely to prevail on an argument that it is entitled to be the vendor that provides such services at the current Marrero or River Ridge facilities, or that it should be entitled to an automatic five-year extension on its current CEA at Marrero rather than be subject to renewable 30-day contracts.

---

[231] *See Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572–73 (5th Cir. 1974) ("The district court does not exercise unbridled discretion [to grant or deny preliminary injunctions]. It must exercise that discretion in light of what we have termed 'the four prerequisites for the extraordinary relief of preliminary injunction.' . . . In considering these four prerequisites, the court must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion. The primary justification for applying this remedy is to preserve the court's ability to render a meaningful decision on the merits.") (citation omitted).

The Fifth Circuit has not articulated a precise level of potential success a plaintiff must show in order to meet this first prong. Although some courts require the movant to show that the likelihood of success on the merits is greater than fifty percent,[232] the Fifth Circuit recognizes that a finding of substantial likelihood does not require a finding of a fixed quantitative value.[233] Rather, "a sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits."[234] These factors "are applied on a case-by-case, sliding-scale basis. Where one or more of the factors is very strongly established, this will ordinarily be seen as compensating for a weaker showing as to another or others."[235]

Here, Plaintiff's showing on the irreparable harm, balance of the hardships, and public interest factors are strong enough to compensate for a lesser showing on the substantial likelihood of success on the merits prong, and Plaintiff is therefore entitled to at least some of its requested relief. However, because "it is inequitable to temporarily enjoin a party from undertaking activity which he has a clear right to pursue,"[236] the Court concludes that Plaintiff is not entitled to the full relief that it seeks at this stage, and that any equitable remedy must be carefully crafted to preserve the status quo only for as long as necessary to ensure that the medical needs of the impoverished and medically underserved communities of Marrero and River Ridge continue to be met while the

---

[232] *See, e.g., Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985).

[233] *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir.1979).

[234] *Id.*

[235] *Knights of Ku Klux Klan, Realm of La. v. E. Baton Rouge Par. Sch. Bd.*, 578 F.2d 1122, 1125 (5th Cir. 1978).

[236] *State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975).

Jefferson Parish Council explores its options.[237] Therefore, Jefferson Parish is enjoined from evicting JCHCC until the Parish either secures new medical providers for the Marrero and River Ridge facilities or until the Parish provides evidence to satisfy the Court that the medical needs of the communities currently served by JCHCC in Marrero and River Ridge can otherwise be adequately met.

### E.    *Amount of Security*

Pursuant to Federal Rule of Civil Procedure 65, if the Court issues a preliminary injunction, the movant is required to give security in an amount that the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The amount of security required pursuant to Rule 65(c) is a matter of discretion of the trial court, and a court may elect to require no security at all.[238] Rule 65(c) allows the court to provide the amount that it "considers proper."[239] However, the Fifth Circuit has recognized an exception to the Rule 65 security requirement in cases where the plaintiff is engaged in public-interest litigation.[240] Neither Plaintiff nor Defendants have addressed the issue of security.

Plaintiff is a non-profit community health center to which Defendants lease facilities free of any rental payment responsibility. Plaintiff brings suit to enjoin the Jefferson Parish Council

---

[237] For example, given that one of the chief concerns raised by Plaintiff is that the patients served by the Marrero and River Ridge facilities, who largely arrive by foot or by bicycle, will be unable to transport themselves to alternative medical facilities, the Court will consider whether Jefferson Parish can meet the needs of its community by providing shuttle services or otherwise establishing that public transportation options and alternative medical facilities can, in tandem, meet the needs of Medicaid beneficiaries.

[238] *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)).

[239] *A.T.N. Indus., Inc. v. Gross*, No. 14-20102, 2015 WL 8105841 (5th Cir. 2015) (per curiam).

[240] *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981).

from evicting it and thereby depriving JCHCC's Medicaid beneficiaries of their right to receive mandatory FQHC services. Defendants have neither requested security in the event that this Court grants a preliminary injunction, nor have they presented any evidence that they will be financially harmed if they are wrongfully enjoined. Because Plaintiff provides benefits that are in the public interest at low or no cost to an underserved community, and Defendants have not identified any risk of monetary loss to them as a result of this preliminary injunction, the Court concludes that no security is required.

## V. Conclusion

For the reasons stated above, the Court has concluded that although JCHCC may not be entitled or have a right to occupy certain spaces owned by Jefferson Parish to provide federally subsidized health care to the poor, the medically underserved populations of Jefferson Parish do have a right to medical services. While Jefferson Parish allows those rights to go unmet and allows buildings to sit vacant while the Council rejects the only bid to provide these services—and continues to extend the deadlines to receive such bids—the medically disadvantaged should not suffer. Therefore, until Jefferson Parish selects a vendor to provide these desperately needed services, or adequately addresses the hardships associated with this medically underserved population's ability to access such services, JCHCC shall remain in place to meet those needs. Accordingly,

**IT IS HEREBY ORDERED** that JCHCC's motion for a preliminary injunction[241] is **GRANTED IN PART** and **DENIED IN PART.** Specifically, the Court will enjoin the eviction

---

[241] Rec. Doc. 2.

of JCHCC until the Parish either secures new medical providers for the Marrero and River Ridge facilities or until the Parish provides evidence to satisfy the Court that the medical needs of the communities currently served by JCHCC in Marrero and River Ridge can otherwise be adequately met. However, Plaintiff's motion is denied to the extent that, once this Court is satisfied that the medical needs of these communities are being met, whether or not the merits have been addressed, the injunction will be lifted.

      **NEW ORLEANS, LOUISIANA**, this <u>26th</u> day of July, 2016.

                                                  **NANNETTE JOLIVETTE BROWN**
                                                  **UNITED STATES DISTRICT JUDGE**